**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :   Case No.: 4:13-CR-00227-ALM-CAN
                            Plaintiff,                   :
                                                        :
                v.                                      :   Hon. Amos L. Mazzant
                                                        :
MICHAEL THOMAS,                                         :
                                                        :
                            Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**SENTENCING SUBMISSION**
**ON BEHALF OF DEFENDANT MICHAEL THOMAS**


Defendant Michael Thomas respectfully submits this memorandum to aid the

Court in his sentencing, scheduled for August 29, 2016.

## INTRODUCTION

"A district court should begin all sentencing proceedings by correctly calculating

the applicable [United States Sentencing] Guidelines range." *Gall v. United States*, 552 U.S. 38,

49 (2007). However, while "the Guidelines should be the starting point and the initial

benchmark" for the Court's sentencing decision, they "are not the only consideration." *Id*.

Indeed, a sentencing court "may not presume that the Guidelines range is reasonable." *Id*. at 50.

Ultimately, the appropriate sentence must instead be determined by reference to the factors set

out in 18 U.S.C. § 3553(a), which provides that "[t]he court shall impose a sentence sufficient,

but not greater than necessary," to serve the purposes of sentencing. Section 3553(a) requires the

1

Court to consider the history and characteristics of the defendant; the nature and circumstances of the offense; the need to protect the public from further crimes of the defendant; the need to promote adequate deterrence; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). Taking these factors into consideration, the Court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. 38, 49-50.

In this case, the Probation Office has recommended a sentence of 41 months' imprisonment and payment of $121,641.21 in restitution based on its application of the Guidelines. (*See* Presentence Report (PSR), Dkt. 101 at 18.) While Mr. Thomas disputes the basis for the Probation Officer's determination, a sentence based even upon a proper application of the Guidelines would be grossly disproportionate to the offense and far "greater than necessary" to serve the interests of justice and the ends of sentencing.

For Mr. Thomas to spend three-and-a-half years in prison, separated from his adoring daughter, would serve neither the victim, nor society, nor justice. Rather, consideration of the §3553(a) factors show that the punishment Mr. Thomas has already received— imprisonment for four months and eight days in Fannin County Jail and the loss of all his savings—is more than sufficient to satisfy the purposes of sentencing. For these reasons, as well as those discussed in detail below, Mr. Thomas respectfully asks that the Court determine that no further custodial sentence is necessary and that restitution be limited to cognizable losses from the damage actually proved at trial.

## I. THE SECTION 3553(A) FACTORS WARRANT A LENIENT SENTENCE.

### A. Mr. Thomas's History and Character.

In the letters submitted to the Court, Mike Thomas's family and friends attest to his reputation as a committed friend, a loving and responsible father, and a hard worker who

overcame significant difficulties in his early life to establish a promising career and build a family. (*See* Ex. A (Letters).) Mike's difficult childhood is described by his former mother-in-law, Phyllis Paton. After his parents separated, Mr. Paton married Mike's father in 1990. "However," Ms. Paton writes, "we divorced when [Mike] was 15." She writes:

> We were together as a family on the weekends and a month each summer, until his mother committed suicide just before Christmas in 1993. It was a terrible blow to him. He then moved in with us fulltime, until our marriage ended in 1993. He moved in with his girlfriend and lived with her parents, as his father suffered from Alcoholism and Bi-Polar Syndrome but would not take his medication. As a result, his father regularly displayed inappropriate behavior and rage. [Mike] emancipated himself as a result and changed his time.

Despite the chaos of his childhood, Mike worked hard to take control of his life. At the age of sixteen, he married his high school girlfriend, Sabrina. Sabrina's mother, Suzana Thieme, writes that "[e]ven though Mike and Sabrina married very young, they were happy. They never fought and the two of them were the best of friends." The same year he married Sabrina, Mike passed the GED, a full year early. He enrolled in a community college with the intention of transferring to a university when he was sophomore. As planned, he then enrolled at the University of North Texas (UNT) and earned his Associates of Science at eighteen, when most of his peers were graduating high school.

Mike went on to earn his Bachelor's degree, and at the same time pursued a number of technical certifications from Novell, Microsoft, and Cisco to make himself marketable to future employers. Upon graduation, he accepted a job with the Denton County Technology Services department and was immediately promoted to the role of Network Administrator. The job provided Thomas a lot of responsibility at an early age and also a sense of purpose. Thomas excelled at the job and was known as a dedicated employee during his eight years there. His

former co-worker, David Slade, writes that his own success in the department "is due in part to Mike's understanding and willingness to help."

Kevil Heil, Mike's best friend since the age of eight, recounts Thomas's path from a troubled childhood to a successful career and family as one that was made possible by Mike's resilience and ability to "make the best of every situation, and take everything in stride." George James, Mike's Professor of Philosophy and Religion at the University of North Texas, describes Mike during this time as "a thoughtful, conscientious, and hardworking young man, committed to the well being of his family," as "an amiable young man who cares deeply about his family and the larger community," and as "a person of strong ethical character."

During his last two years of employment with Denton County, Mike enrolled in a Masters of Business Administration program at the Southern Methodist University in Dallas, working fulltime and attending night classes twice a week. Mike's decided to pursue an MBA degree out of a desire to be challenged and to learn a new set of skills. This desire to expand his horizons extended beyond academic pursuits. Thomas and Sabrina were avid travelers, taking time off between many of the major life events of their lives to travel to Europe, Jamaica, Brazil, and elsewhere. After earning his MBA, Mike spent 6 months in Brazil with Sabrina, learning the culture and visiting his wife's family.

After that trip to Brazil, Mike returned to IT as a consultant. He and Sabrina purchased their first home and soon had their first daughter, Isabella. Thomas describes Izzy's birth as the happiest day of his life. Phyllis Paton says that "[w]hen his daughter was born, he was finally whole. I have never seen a father so devoted to his daughter and she so in love with her father." Sabrina describes Mike's relationship with Izzy: "He loves his daughter more than

life itself and of course she loves him as only a daughter can. He is a playful, silly, loving, proud, and devoted father."

The technology consulting job, with its constant travel requirements, began take Mike away from his new family too often. He began to look for work that would not require nearly as much travel so that he could be with his family and see his daughter grow up. That opportunity came via a phone call from an old friend, Drew Cain. Drew told Mike about an opening at ClickMotive for a systems administrator. The job would not require him to travel as much as his former and offered him more pay and greater responsibility. Mike took the job in February 2010.

Upon Mike's departure from ClickMotive, his actions and the resulting prosecution threatened and finally dismantled the Thomases' happy life. When the family moved to Brazil, Mike's troubles followed—his indictment and mounting financial difficulties eventually led Mike and Sabrina to pursue divorce after 21 years of marriage. According to Sabrina, Mike's depression and anxiety over the charges against him were the main causes of their separation. She writes that, during this time, Thomas often contemplated suicide—it was only the thought of his daughter growing up without a father that kept him going.

Despite the destructive impact of Mike's choices over that weekend in December of 2011, the letters from his friends and family demonstrate that those events are an aberration in a life marked by loyalty, friendship, and dedication to work and family. As Sabrina writes, despite the couple's painful separation: "Michael is a good man. . . . He is admired by his friends. He is an intelligent, ambitious and respected colleague. I implore you to please show compassion for Michael and his family as you consider his sentencing."

**B.**      <u>**The Nature and Circumstances of the Offense.**</u>

Every aspect Mr. Thomas's offense distinguishes it from the self-interested and destructive conduct more typically prosecuted under Computer Fraud and Abuse Act (CFAA), such as in the cases described below in section I(F). These distinctions begin with the motive advanced by the Prosecution at trial: that Mr. Thomas's actions—though unquestionably rash and misguided—were in defense of a friend, Andrew Cain, who considered Mr. Thomas as "really [his] only friend." (See Ex. B (Cain Testimony) at 4:13.) As ClickMotive's CTO, Ray Myers, testified, Mr. Cain "had been with [ClickMotive] since day one." (See Ex. C (Myers Testimony) at 9:13.) His sudden termination "was a shock to him." (See *id.* at 85:9-14.) After his termination, Mr. Cain expressed the reason for his shock to Mr. Myers: "I constantly put clickmotive first over the last 6+ years instead of my own family because I trusted you and believed you were going to help us reach our dreams." (Ex. B1 (Email from A. Cain to R. Myers) at 3.) Because of his termination, Mr. Cain's "wife [was] threatening with divorce." (*Id.*) Without her, Mr. Cain told Mr. Myers, he "won't have anything to live for." (*Id.*)

Mr. Thomas took his friend's termination—and his pain—personally. He resolved to quit in protest. And believing, as Mr. Cain did, that his friend had been exploited by ClickMotive, Mr. Thomas "did not want the job [that he and Mr. Cain had done for ClickMotive] to be easier for the next person." (*See* Testimony of Kathryn Sherman.)[1] But the evidence at trial makes it clear that, despite his anger at the company, Mr. Thomas did not intend to cause it real harm.

---

[1] The Defense obtained transcripts of certain witnesses' testimony after reaching an agreement with the Government to use a portion of the funds seized from Mr. Thomas for this purpose. However, due to delays in this process, the Court Reporter was not able to produce transcripts for every witness before sentencing submissions were due. In such cases, specific transcript citations are omitted.

The Government elicited extensive testimony from ClickMotive's owners about how much damage Mr. Thomas *could* have done. The company's CEO, Stuart Lloyd, described the importance of the websites that ClickMotive maintained for its clients. (*See, e.g.*, Ex. D (Lloyd Testimony) at 3:17-4:23.) Those websites were "the most important lead source" for ClickMotive's clients. (*Id*. at 4:10-11.) They were "[v]ery complex, very automated systems" comprising "thousands and thousands of pages of content." (*Id*. at 4:18-23.) They were so important that they were housed offsite "in a third party data center" that was "highly, highly secure." (*Id.* at 6:6-22.) The website data was so important, in fact, that "[w]ithout it," ClickMotive's owners "would have no company." (*Id*. at 26:12-15.)

Asked about Mr. Thomas's responsibilities regarding these websites, Mr. Lloyd testified that Mr. Thomas had "complete access to passwords, controls, hosting environments" and therefore was in "a very, very important position," "like a bodyguard" for these critical assets." (*See id.* at 11:14-12:5.) Mr. Myers described Mr. Thomas as one of only four or five employees with "root access" to the company's systems. (Ex. C (Myers Testimony) at 18:16-19.) This meant Mr. Thomas had "access to everything" and therefore "a tremendous amount of power." (*Id.* at 19:5-7; 18:21-25.)

After this dramatic presentation of Mr. Thomas's awesome destructive capability, Mr. Myers finally—on cross-examination—told the Court how Mr. Thomas wielded that power when he became angry at ClickMotive: "I do not have any records of him deleting data from the Rackspace servers [that hosted the client websites]." (*Id.* at 154:20-21.) Nor did Mr. Myers "see any evidence" that Mr. Thomas "caused any customer sites to go down." (*Id.* at 154:16-18.) Nor did Mr. Myers "have any record of Mr. Thomas's activity disrupting the availability of any customer Website." (*Id.* at 154:22-24.) In fact, ClickMotive did not "have any record of [Mr.

Thomas] logging on to those Rackspace servers" at all during the period of the charged conduct. (*Id.* at 154:13-15.)

Mr. Cain testified to Mr. Thomas's actual intent. Though Mr. Thomas "could have cost [ClickMotive's owners] up to $50 million," as Mr. Lloyd said, all he actually did—all he actually intended to do—was "tinker[] with the system." (Ex. B (Cain Testimony) at 10:4-5.) He "changed some things that did not need to be changed" but his actions "were mostly harmless." (*Id.* at 10:5-9, 14:11-13.) Not only did leave ClickMotive's most important data alone, he didn't delete any data that wasn't readily available elsewhere. While he deleted backups of the Microsoft Exchange server, that server had redundant storage that made recovery possible without a backup. (*Id*. at 16:18-25.) The other servers he deleted remote backups of were backed up locally; he left those backups alone. (*Id*. at 17:4 – 18:4.) The wiki pages he deleted were also backed up; ClickMotive recovered them within a day. (Ex. E (Rangel Testimony) at 30:20 – 33:3.)

Not only did Mr. Thomas have no intention of causing the catastrophic damage the Government's witnesses say they feared, he worked over the weekend to prevent and repair damage to ClickMotive's systems. On Friday, December 2, 2011, ClickMotive lost power in its offices "for several hours." (Ex. B (Cain Testimony) at 9:9-15.) Several of the company's systems went down and Mr. Thomas "had trouble getting them back on-line." (*Id.*) He reached out to Mr. Cain "essentially on ClickMotive's behalf, to get [Cain's] help" to fix the network. (*Id.* at 20:3-5.) On December 4, 2011, ClickMotive's network was attacked, heavily taxing the network and cutting the company's systems off from the Internet. (*See* Testimony of Kevin Ates.) Mr. Thomas went into the office on a Sunday evening, the day before he resigned from

ClickMotive, and repaired the network so that ClickMotive could resume work on Monday morning. (*See id*.)

While Mr. Thomas's actions were inexcusable, they also do not reflect the kind of serious conduct the CFAA was written to criminalize. He caused no damage that was not easily reversed. He did not attempt to damage or impair any business critical data. His actions were not motivated by personal gain. And it is clear from the evidence that Mr. Thomas believed that his actions were essentially harmless. As Mr. Cain testified, Mr. Thomas was "confused and upset" when ClickMotive served him with civil discovery demands. (Ex. B (Cain Testimony) at 23:2-8.) Mr. Cain, asked about his initial reaction to the civil and criminal charges against Mr. Thomas, testified that he "didn't think anything Mr. Thomas had done merited a civil lawsuit" and believed that Mr. Thomas's actions "[a]bsolutely [did] not" merit criminal charges. (*Id.* at 23:21-25.)

To be sure, in convicting Mr. Thomas, the jury determined that he acted with the intent required by the law, and Mr. Thomas accepts the jury's verdict. And concededly neither Mr. Thomas nor Mr. Cain were experts on the law. But their reaction to the charges was not unfounded. As the Court noted during the hearing on motions in limine, the Magistrate Judge assigned to this case—one whose "province and duty" it "emphatically" is "to say what the law is"—likewise expressed the belief that this should have been a civil matter. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). Taken together, this evidence demonstrates that Mr. Thomas's offense was less serious than most, both in conception and in execution.

These facts also demonstrate the failure of the Sentencing Guidelines to account for less serious offenses such as Mr. Thomas's. This is nowhere more evident than in the mechanical 4-point offense-level increase applied to every §1030(a)(5)(A) offense. The

Sentencing Commission's rationale for this enhancement is that §1030(a)(5)(A) offenses "require[] a heightened showing of intent to cause damage" relative to other CFAA offenses. (*See* Ex. F (United States Sentencing Commission, Amendments to the Sentencing Guidelines, Nov. 1, 2003) at 15). This same four-level enhancement would have applied if, instead of deleting only backup data, Mr. Thomas had deleted all of ClickMotive's data and taken a drill to its hard drives. *See* U.S.S.G. § 2B1.1(b)(18)(A)(ii). By contrast, if Mr. Thomas had stolen passwords from a computer controlling the national electric grid—but not intended any "damage" to that computer—he would have qualified for the milder 2-point enhancement for offenses involving "a computer system used to maintain or operate critical infrastructure." *See* U.S.S.G. § 2B1.1(b)(18)(A)(i).

In applying the Guidelines, the PSR therefore recommends a wildly disproportionate term of imprisonment, mainly for two reasons. First, as detailed below, the Probation Office uncritically accepted ClickMotive's highly questionable account of its losses. Second, the Guidelines inappropriately treat every CFAA violation as an economic crime, even in cases like this, where the Defendant neither sought financial gain from the offense nor specifically intended financial harm to the victim. This miscategorization is analyzed at length in a forthcoming article by Prof. Orin S. Kerr, a leading CFAA scholar. *See* Orin S. Kerr, *Trespass, Not Fraud: The Need for New Sentencing Guidelines in CFAA Cases*, Geo. Wash. L. Rev. (forthcoming), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2781111. Prof. Kerr points out that "[m]ost CFAA offenses are trespass offenses, not economic crimes" and that "[a]lthough CFAA offenses can cause economic losses, their extent is usually a matter of bad luck rather than design." *See id.* at 2. As a result, "[a]ssumptions about how to measure culpability built into

[U.S.S.G §] 2B1.1 often misfire when applied to CFAA crimes" and "lead to sentences far removed from what the goals of punishment would suggest is appropriate." *Id*.

Prof. Kerr's thesis is illustrated nowhere as well as in this case. If ClickMotive's loss figures are to be believed, it incurred $50,750 of its $121,641.21 in alleged losses between two and thirteen months after the alleged offense—after ClickMotive "stopped seeing symptoms" of any problems caused by Mr. Thomas. (*See* Ex. G (Gov. Tr. Ex. 5); Ex. C (Myers Testimony) at 52:11-14.) At trial, Mr. Myers said that these purported losses resulted because ClickMotive was "worried there might be some" more problems to be found. (*Id.* at 163:11-15.) The company found "more information that [it] wanted to check on," but ultimately found no evidence that this "information" had any relation to Mr. Thomas's actions, or that Mr. Thomas left on ClickMotive's network any malware, viruses, logic bombs, or anything else that would have caused delayed issues. (*See id*. at 164:1-12.) This is what Prof. Kerr means when he writes that the Guidelines' loss enhancements come down to a CFAA defendant's bad luck: in essence, the Government proposes that Mr. Thomas's sentence should be enhanced because ClickMotive spent 310 hours wondering whether Mr. Thomas caused problems that in fact had nothing to do with his conduct. And as we demonstrate below, these entries are far from the only inappropriate or inflated figures provided by ClickMotive.

Mr. Thomas therefore urges the Court to enter a sentence that reflects not the Guidelines' mechanical and overly punitive approach, but the true nature of his offense: conduct that was not intended to inflict financial harm on ClickMotive and that was mitigated by efforts to protect ClickMotive from harm unrelated to his actions.

C.     **A Non-Custodial Sentence is Adequate for Deterrence**

The Court is required to weigh "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The letters from Mr. Thomas's former colleagues, family, and friends reveal his reputation as a reliable and valued employee and a devoted provider to his family. His offense in this case stands as an aberration in what has otherwise been a life of dedication, kindness, and personal sacrifice for those who depend up on him. Nothing in his background suggests that Mr. Thomas is likely to re-offend.

Moreover, Mr. Thomas has endured incalculable consequences as a result of his offense. Prior to indictment, Mr. Thomas was compelled to spend much of his family's savings on legal fees, first responding to ClickMotive's since-aborted civil claims, and then for counsel regarding the criminal investigation. As Mr. Cain testified at trial, the civil claims came as a shock to Mr. Thomas, but the criminal charges—and the possibility of being imprisoned away from his family—were inconceivable. In response, Mr. Thomas made a poor decision that would only worsen his desperate situation, moving his family to Brazil before the indictment issued.

His time in Brazil, as his mother-in-law Phyllis Paton writes in her letter, was its own prison. He could not find enough work to provide adequately for his family. He fell into a depression that strained and ultimately ended his marriage of 20 years. After his assets were seized by the government, his lawyer would not return his calls and he had difficulty interesting any others in his case, because he could not guarantee payment. Mr. Thomas finally corrected his mistake; he bought his own ticket back to Dallas and submitted himself voluntarily to U.S. authorities on April 20, 2016. By that time he had already paid for his actions with everything he had.

Mr. Thomas has been detained since that day in Fannin County Jail. By the time he is sentenced, he will have served over four months in jail—four months during which he

couldn't visit his beloved daughter Izzy. Sabrina Thomas writes about how Mr. Thomas has been affected by the charges against him and the separation from his family: "Every day, for the last few years until today, he regrets the decisions that have led him to his current situation." (Ex. A (Letters).) Mr. Thomas has learned from his mistake. His family has suffered and their suffering has multiplied his own, as well as his deep regret for his conduct. No custodial sentence beyond the time he has already served is necessary to deter Mr. Thomas from committing further offenses.

Likewise, no further custodial sentence is necessary for the purpose of general deterrence. By definition, an offense like Mr. Thomas's can only be committed by an IT professional, someone who has invested significantly in the education and certifications necessary to attain a desirable career in a competitive field. The evidence shows that, in this case, the reason criminal charges did not deter Mr. Thomas is that he did not comprehend that his conduct could be criminal. (Ex. B (Cain Testimony) at 23:21-25.) To the extent that others in Mr. Thomas's position are similarly unaware that such conduct could constitute a federal felony, no sentence could possibly influence them. But for those who are aware, any custodial sentence— including the four-month term Mr. Thomas has already served—would be adequate to deter them from committing the same offense.

### D. A Non-Custodial Sentence is Appropriate Given the Available Sentences

Section 3553 requires the Court to consider "the kinds of sentences available," 18 U.S.C. § 3553(a)(3). In this case, the Court has two ready alternatives to a custodial sentence that would better serve the interests of justice: supervised release and restitution. As detailed above, the only harm alleged by the Government is the indirect financial harm ClickMotive incurred investigating and remediating Mr. Thomas's actions. The bulk of this work was completed

within a week and the rest within a month—one quarter of the time Mr. Thomas has already served in Fannin County Jail.

To the extent ClickMotive's financial losses are proved, restitution is the most effective remedy. But so long as Mr. Thomas remains incarcerated, he will have no means of paying restitution; all he owns in the world is already in the possession of the Clerk. He will also have no means of supporting his wife and daughter. If the court orders time served and a period of supervised release, Mr. Thomas can immediately apply his considerable skills and work ethic—to which ClickMotive's owners testified at trial—toward making the victim whole. (*See* Ex. C (Myers Testimony) at 14:21-24 (describing Mr. Thomas as "a very good employee" and "hard worker" with an "impress[ive] . . . ability to solve problems").)

It is the Defense's understanding that the victim does not wish for the Court to impose a custodial sentence. Likewise, the Government advanced from the beginning a plea offer pursuant to which it would recommend probation rather than a custodial sentence; on the eve of trial, it offered to recommend time served and a period of supervised release. (*See* Ex. H (Email from C. Lopez to R. Prado); Ex. I (Email from C. Lopez to A. Williamson).) It is clear from these offers that the Government itself does not consider a further custodial sentence necessary to serve the ends of sentencing.

## E.     A Non-Custodial Sentence Will Enable Mr. Thomas to Continue Mental Health Treatment

The Court is also directed to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). As the Probation Office reports, Mr. Thomas has previously been diagnosed with manic depression.

(PSR ¶ 45.) During his time in Brazil, Mr. Thomas received counseling and medication for depression and anxiety. (PSR ¶ 46-47.) At times he was suicidal. (PSR ¶ 47.)

While the Probation Office recommends that Mr. Thomas receive mental health treatment "while the defendant is imprisoned and on supervised release," the reality is that Mr. Thomas is only likely to receive adequate treatment upon release. (*See* PSR ¶ 47.) As the Bureau of Prisons (BoP) itself acknowledges, it does not have the resources to provide appropriate care to inmates. *See* U.S. Department of Justice, Office of the Inspector General-Audit Division, Audit of the Federal Bureau of Prisons Pharmacy Services (November 2005) (stating that "[t]he Federal Bureau of Prisons (BOP) is faced with a significant challenge in providing adequate and cost-effective medical care to inmates because of the rising federal inmate population and the increasing cost of prescription medications"). Psychological treatment programs are offered at very few facilities and capacity for them is extremely limited.  See BoP Program Statement 5330.11, Chapter 6, Page 2, available at https://www.bop.gov/policy/progstat/5330_011.pdf (the four programs open to male inmates can accommodate only 192 inmates.  Furthermore, the admissibility requirements of these programs would likely exclude Mr. Thomas, as they are generally directed at inmates who are able to demonstrate long term and serious impairments. See BoP Program Statement 5330.11, Chapter 6, Page 2 (inmate must be in need of "intensive treatment services," demonstrated by the inmate's "multiple psychiatric hospitalizations," "complex psychotropic treatment," "major mental health related functional impairment," and/or "repeated instances of severe behavioral problems").

While the Defense recognizes that this Court has the unenviable duty of imposing prison terms upon defendants for whom no alternative sentence would be appropriate, that is not

the case here. An order of time served, supervised release, and restitution would serve the interests of justice and enable Mr. Thomas to seek the mental health treatment that he needs.

**F.** **A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.**

To ensure fairness and consistency in sentencing, § 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A review of cases involving similar CFAA violations shows that courts have deemed probation and restitution adequate sentences, even in cases involving substantially more culpable conduct than Mr. Thomas's. To avoid unwarranted disparities between Mr. Thomas's sentence and those issued in these cases, Mr. Thomas urges the court to order a non-custodial sentence here as well.

*United States v. Phillips* involved a University of Texas at Austin ("UT") computer science student who abused his access to the UT's network to hack into computers on other networks and steal sensitive information, in violation of UT's "acceptable use" policy. *See generally United States v. Phillips*, 477 F.3d 215 (5th Cir. 2007). The defendant "us[ed] various programs designed to scan computer networks and steal encrypted data and passwords," "succeed[ing] in infiltrating hundreds of computers, including machines belonging to other UT students, private businesses, U.S. Government agencies, and the British Armed Services webserver." *Id.* at 217. "In a matter of months, Phillips amassed a veritable informational goldmine by stealing and cataloguing a wide variety of personal and proprietary data, such as credit card numbers, bank account information, student financial aid statements, birth records, passwords, and Social Security numbers." *Id.* "Phillips's actions hurt the UT computer system," causing it "to crash several times." *Id.* at 218. As a result, "[h]undreds of UT web applications became temporarily inaccessible, including the university's online library, payroll, accounting,

admissions, and medical records." *Id.* UT spent $182,000—well over the losses claimed here—
"to assess the damage and . . . to notify victims that their personal information and Social
Security numbers had been illicitly obtained." *Id.* Phillps received a sentence of five years'
probation, five hundred hours of community service, and restitution of $170,056." *Id.* 218–19.

  *United States v. Morris*, a Second Circuit case, similarly involved a defendant
who "released onto [the Internet] . . . a computer program known as a 'worm' that spread and
multiplied, eventually causing computers at various educational institutions and military sites to
'crash' or cease functioning." United States v. Morris, 928 F.2d 504, 505 (2d Cir. 1991). "The
estimated cost of dealing with the worm at each installation ranged from $200 to more than
$53,000." *Id.* Upon conviction at a jury trial of violating 18 U.S.C. § 1030(a)(5)(A), the same
provision at issue here, Morris "was sentenced to three years of probation, 400 hours of
community service, a fine of $10,050, and the costs of his supervision." *Id.* at 506.

  *United States v. Middleton*, like this case, involved a "dissatisfied" employee
who, upon quitting, modified and deleted data on his ex-employer's systems. *United States v.
Middleton*, 231 F.3d 1207, 1208 (9th Cir. 2000). Among other things, Middleton used his access
to another employee's account to gain access to a company computer used "to perform internal
administrative functions and to host customers' websites." *Id.* at 1209. "After gaining access to
the . . . computer, Defendant changed all the administrative passwords, altered the computer's
registry, deleted the entire billing system (including programs that ran the billing software), and
deleted two internal databases." *Id.* Unlike Mr. Thomas, the defendant in *Middleton* deleted data
currently in use on production systems, including business-critical billing software. The victim
spent 154 hours investigating and repairing the damage, "bought new software to replace
software Defendant had deleted, and . . . hired an outside consultant for technical support." *Id.*

Like Mr. Thomas, Middleton was charged under § 1030(a)(5)(A). On these strikingly similar

facts, "the district court sentenced [Middleton] to three years' probation, subject to the condition

that he serve 180 days in community confinement. The court also ordered Defendant to pay

$9,147 in restitution." *Id*.

Each of these defendants engaged in more serious conduct than Mr. Thomas and

caused more harm, but none of them was sentenced to a term of imprisonment. To avoid

unwarranted disparity between Mr. Thomas and these defendants, the Defense asks the Court to

impose a non-custodial sentence.

## II.        THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE.

Although the court is only legally obligated to consider the factors of 18 U.S.C.A.

§ 3553(a), it must nonetheless compute Mr. Thomas's sentence under the guidelines. *United

States v. Tzep-Mejia*, 461 F.3d 522, 525 (5th Cir. 2006). The Probation Office calculated Mr.

Thomas's Guideline Offense Level to be 22, which corresponds to a Guidelines recommendation

of 41-51 months. (Dkt. 101 at ¶ 63.) For the reasons below, Mr. Thomas respectfully disagrees

with the Probation Office's calculation of his offense level as well as its calculation of

ClickMotive's loss.

### A.        No Loss Enhancement is Warranted.

The PSR calculates loss to ClickMotive at $121,641.21. According to USSG §

2B1.1(b)(1)(E), monetary loss exceeding $95,000 but less than $150,000 requires a sentencing

enhancement of 8 points. (Dkt. 101 at ¶ 22.) The loss amount of $121,641.21, however, includes

several purported losses that are either not cognizable under the CFAA or are unsupported by the

trial record.

As this Court has previously ruled, "loss" under 18 U.S.C. § 1030(e)(11)

"encompasses only two types of harm: costs to investigate and respond to a computer intrusion,

and costs associated with a service interruption." *See Frisco Med. Ctr., L.L.P. v. Bledsoe*, 147 F. Supp. 3d 646 (E.D. Tex. 2015). *See also Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 630 (S.D. Tex. 2011); *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 776 (S.D. Tex. 2010); *Oil States Skagit Smatco, LLC v. Dupre*, No. CIV.A.09-4508, 2010 WL 2605748, at *3 (E.D. La. June 21, 2010). At trial, ClickMotive witnesses acknowledged that Mr. Thomas's actions did not cause any interruption in service or lead to any lost business. Ray Myers, ClickMotive's former CTO, testified that none of ClickMotive's customers' websites were affected. (Ex. C (Myers Testimony) at 154:13-24). Moreover, the loss spreadsheet prepared by ClickMotive does not list any lost business or any loss due to a service interruption, but instead characterizes all costs (apart from outside legal, travel, and forensic investigation fees) as "opportunity costs." *See* Gov. Ex. 5. Therefore, ClickMotive can only have incurred loss to "investigate and respond to" the alleged damage. *See Frisco Med. Ctr.*, 2015 WL 7734108 at *10.

### a. The Loss Amount Should Exclude Legal Costs

Loss associated with investigating and responding to a computer intrusion does not include "the costs of hiring an expert to assist in litigation." *Quantlab Techs.*, 2015 WL 1651251, at *6. This is because "[t]he costs of retaining legal experts is not reasonably necessary to restore or resecure Plaintiffs' computers, and therefore, is not within the scope [of CFAA loss]." 171 F. Supp. 2d at 683 (*citing United States v. Middleton, 231 F.3d 1207 (9th Cir. 2000)*)); *see also In re Mud King Products, Inc.*, No. BR 13-32101, 2015 WL 862319, at *7 (S.D. Tex. Feb. 27, 2015). Applying this principle, the court in *Mud King Products* refused to include in its loss computation any expert fees associated with creating forensic images of affected computers, finding that the forensic imaging was carried out for the purpose of preserving digital evidence for trial rather than the "investigat[ing] or assess[ing] of any

impairment to data, computer programs, systems, or information." *In re Mud King Products, Inc.*, 2015 WL 862319, at *7.

The outside forensic firm engaged by ClickMotive was not hired to restore or resecure damaged systems but rather was hired upon the advice of ClickMotive's attorneys to gather evidence for litigation and to support a criminal prosecution. (*See* Ex. J (Def. Tr. Ex. 58).). Therefore, all costs attributed by ClickMotive to legal fees and the cost of working with an outside forensics firm must be excluded from the loss figure. (*See* Ex. G (Gov. Tr. Ex. 5.)[2] The law requires that the full amount of these items—$43,669.87— be excluded it their entirety. The Probation Office agreed with the conclusion that cost related to preparing for litigation should be excluded from the sentencing calculation. (Dkt. 101 at pg. ii.) However, it appears that the officer only subtracted the line titled "Legal Fees" amounting to $36,869.87. This figure does not include $6,800 worth of itemized entries that relate to non-cognizable legal fees or forensic analysis.

  *b. The Loss Amount Should Exclude Costs Proven to Be Unrelated to Restoring and Resecuring ClickMotive's Systems, Totaling $53,400*

The loss calculation should also exclude all entries dated after January 6, 2012. At trial, ClickMotive CTO Ray Myers testified that ClickMotive "stopped seeing symptoms" related to Mr. Thomas's actions "within a month" following his resignation from ClickMotive. (Ex. C (Myers Testimony) at 52:11-14.) Mr. Thomas resigned on December 5, 2011, meaning that—by ClickMotive's own admission—the company finished "restor[ing] or resecur[ing]" its systems no later than the first week of January 2012. *See Thurmond*, 171 F. Supp. 2d at 682-83.

---

[2] This figure includes the "Legal Fees" line item at the end of the spreadsheet as well as the entries bearing the following descriptions: "Review contract from Thomas; advise on direction"; "Communication with legal & forensics"; "Legal; communication"; and "Working on site with forensics & contractors."

Therefore, the entries supposedly reflecting ClickMotive's losses between January 6, 2012 and March 2013—totaling $50,750—cannot constitute "loss" and should be excluded. While Mr. Myers testified that ClickMotive had lingering worries over the subsequent months about hidden damage that Thomas may have caused, no such damage materialized. (Ex. C (Myers Testimony) at 163: 11-25; 164: 1-12.) The CFAA only recognizes loss related to damage that actually occurred. In addition, two entries clearly relate to ongoing maintenance and support for ClickMotive's systems, rather than remediation of damage: "F5 Maintenance; Working with Jeremy Pope (former employee)" and "Meet with Support Team." These items total $2,100 and should be excluded.

c. *The Loss Amount Should Exclude Costs Unrelated to Proven Damage, Totaling $4,100*

"Loss" under the CFAA includes only costs incurred "by reason of a violation," meaning losses that are attributable to the damage actually proved. *See Thurmond v. Compaq Computer Corp.*, 171 F. Supp. 2d 667, 678 (E.D. Tex. 2001). However, ClickMotive's spreadsheet includes alleged losses unrelated to any "damage" alleged in the indictment or proved at trial, specifically the entries labeled "Microsoft support retoring [sic] Sharepoint," "Continuing working with Microsoft on Sharepoint," "Inventory cleanup failure (tied to Thomas' account)," "Buchannan," "Support communciation (Salesforce & policy)," "Transferred off project to Tech Support; then up late restoring email," and "Fixing Forefront (email relay left open)." These losses do not relate to any damage proved at trial, so the corresponding total of $4,100 should be excluded.

d. *The Loss Amount Should Exclude Unsupported Items, Totaling $101,291.21*

Most of the entries in the "loss" spreadsheet provided by ClickMotive bear no description. The Government did not attempt to prove that any of these entries relating to

"restor[ing] or resecur[ing]" ClickMotive's systems. When asked about specific blank entries at trial, ClickMotive CTO Ray Myers admitted he had no idea what specific activities the entries related to. (Ex. C (Myers Testimony) at 165:11-23.) Because the Government cannot establish that even one of these entries properly constitutes CFAA loss, all of them—totaling $101,291.21—should be excluded.

### e. The Properly Included Items Should Be Discounted

The only entries that describe actions that related to restoring or re-securing ClickMotive systems from damage proved at trial are the following: "re-enabling VPN (remote from California)," "Pagers, damage control," "Re-enabling pager system," "Emergency flight to Dallas; Up late with email," "Restoring backups," These entries total $6,200, corresponding to a 2-point enchantment under USSG § 2B1.1(b)(1)(B).

However, the evidence presented at trial demonstrates that even this number is grossly inflated. Witnesses from ClickMotive admitted that, when Mr. Thomas resigned from ClickMotive—days after the company fired Andrew Cain, the only other member of its IT department—the company did not immediately hire a replacement for either employee. (Ex. C (Myers Testimony) at 164:13-25; 165:1-7.) Instead, it used existing staff to investigate and remediate issues with its network—specifically, software developers with no network administration expertise and no previous experience managing the ClickMotive network. (*Id.*) Consequently, it took them far longer to diagnose and repair those issues than it would have a qualified network administrator. For example, Jeff Gonzalez testified that all that was necessary to re-enable ClickMotive's VPN was to re-start the program NPS. (DX 62) (Ex (Jeff Gonzalez) at 52:9-17). Mr. Thomas's expert witness, Chuck Easttom, testified that this task would take only about 10 minutes for an experienced network administrator, and the Government did not present evidence to the contrary. However, ClickMotive's spreadsheet states that Mr. Gonzalez spent

*eighteen hours* (valued by ClickMotive at $2,250) "re-enabling [the] VPN." (*See* Ex. G (Gov. Tr. Ex. 5) at 1.)

It is also evident both from the spreadsheet and from the testimony at trial that these employees did not spend their time exclusively on restoring and resecuring the network. Rather, they were assigned to maintain and operate the ClickMotive network in the absence of Mr. Thomas and Mr. Cain. (Ex. C (Myers Testimony) at 164:13-25; 165:1-7.). It is impossible to discern from the time entries provided, or from the evidence at trial, what proportion of each entry was devoted to improper "losses" such as routine maintenance and administration of the ClickMotive network, and what proportion was actually devoted to recovering from damage caused by Mr. Thomas.

Moreover, the employees assigned to take over Mr. Thomas's and Mr. Cain's regular job responsibilities were essentially doing the jobs of two full-time employees in addition to their regular jobs. It is to be expected that they would have to work long hours in the wake of Mr. Thomas's resignation to manage these extra responsibilities. However, Mr. Thomas was an at-will employee entitled to resign at any time, (*see* Ex. K (Gov. Tr. Ex. 3) at 5), and the cost of replacing a lost employee does not qualify as CFAA loss. Therefore, the time entries of Jeff Gonzalez and Marko Rangel should be discounted accordingly—Mr. Thomas respectfully submits that the appropriate discount rate for these entries is 50%. This would bring the loss amount to $3,100, requiring no sentencing enhancement under USSG § 2B1.1(b)(1)(A).

### B.      No Enhancement for Use of Sophisticated Means is Warranted.

The PSR states that, under U.S.S.G. § 2B1.1(b)(10)(C), a two-level enhancement is warranted because the offense involved sophisticated means. The PSR states that the conduct was sophisticated because the defendant "destroyed the computer's backup files, created an

automated job designed to delete 615 files of backup history, and disabled the pager system so that executives would not be notified that something was wrong with the system." (PSR ¶ 23).

Deleting backup files does not support this enhancement. The Sentencing Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. §2B1.1 cmt. n.9(B). There is nothing to suggest that the deletion of the backup files required any advanced skills, knowledge, or techniques. Rather, deleting backup files requires the same knowledge as deleting any other file on ClickMotive's systems. Additionally, to avoid double counting, an enhancement must only be applied "to the same course of conduct" if the enhancement "targets a different aspect of Defendants' behavior." *United States v. Abulyan*, 380 F. App'x 409, 412 (5th Cir. 2010). Destruction of backup files in order to ensure that ClickMotive's system could not be restored to their original state is precisely what gave rise to liability for the base offense. The CFAA defines damage as "any impairment to the integrity or availability of data, a program, a system, or information" § 1030(e)(8). Thus deletion of back-up files was not a mere "aspect" or "sophisticated means" of carrying out the base offense, but rather essential to their being a violation of the base offense in the first instance. Therefore, this enhancement would constitute impermissible double-counting, and cannot not be applied. Disabling the pager system also does not support this enhancement. At trial, witnesses for both parties testified that there were legitimate reasons why Thomas would have turned off pager alerts, for example to avoid unnecessarily alerting others (including waking them up in the middle of the night) while he was resolving network issues. The evidence showed that the pager system was turned off after the network suffered issues related to a power failure. To reach its verdict, the jury was not required to reach any conclusion about why the pager system was turned off. (*See* Dkt. 92.) It would be

inappropriate to premise an enhancement on a theory that Thomas turned the pager system off for malicious purposes when this was not proved at trial.

Lastly, the use of an automated job to delete backup files does not support this enhancement. Using an automated job to delete digital files is not "especially complex or especially intricate." Rather, the average computer user routinely makes use of automated jobs to perform computer task, such as scheduling virus scans, adding names and addresses to letters and envelopes in order to facilitate sending mail (*i.e.* mail merge), and the deletion of browser history. There is no evidence to suggest that any advanced computer skills were required to "create" the automated job used to delete the backup files. Moreover, automated jobs are an ordinary and well-documented means of deleting backup files using the backup software employed by ClickMotive.[3]

The Government's witnesses also testified that Thomas made no effort to conceal or obscure that fact that he was the source of the automated job even though he could have created a separate user account rather than use his own credentials. (Ex. C (Myers Testimony) at 27:6-21; 38:19-25; 39:1-25.); *c.f. United States v. Collins*, 774 F.3d 256, 266 (5th Cir. 2014) (holding scheme was sophisticated where it "involved the use of multiple post office boxes opened by several different individuals, fictitious chiropractic clinics, for which assumed name certificates were obtained, pre-paid cell phones used to respond to claim inquiries, fake medical records, and fake entities and addresses."). Therefore, the deletion of backup filed and disabling of the pager system do not reflect efforts to "conceal" the offense.

---

[3] Hemant Jain, *Automated Disk management and Data retention in Backup Exec (DLM or Data LifeCycle Management)*, Veritas, April, 14 2015, http://www.veritas.com/community/articles/automated-disk-management-and-data-retention-backup-exec dlm-or-data-lifecycle-management.

For these reasons, the sophisticated means enhancement should not be applied.

### C. Mr. Thomas objects Objects to the 2-Level Enhancement for Use of a Special Skill

The PSR states that under USSG § 3B1.3 a two-level increase is warranted where a defendant abuses "a position of trust or special skill in a manner that significantly facilitated the commission or concealment of the offense." (PSR ¶ 26). The PSR report finds that Thomas "abused his special skill as IT Operations Manager to delete specific backup files and disable the pager system." (Id.) The Sentencing Guidelines define "special skill" as a "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing" such as "pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. §3B1.3, Cmt., (n.4). As discussed above, it has not been established that the pager system was disabled to facilitate or conceal the offense. Additionally, the ability to delete backup files does not require any special skills unavailable to the general public. Rather deleting backup files requires the same means and methods as deleting any other file type, and thus is a skill possessed by the average computer user who deletes files located on their hard drive.

### III.     Restitution

The PSR directs the Court to award ClickMotive $121,641.21 under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. (Dkt 101 at ¶ 72.) The government has the burden of proving a victim's actual losses, and the court must resolve disputes as to the amount of restitution using the preponderance of the evidence standard. *United States v. De Leon*, 728 F.3d 500, 506-507 (5th Cir. 2013). Additionally, only losses "attributable to the specific conduct supporting the offense of conviction" are cognizable as restitution. *United States v. Griffin*, 324 F.3d 330, 368 (5th Cir. 2003).

For the reasons set forth above in Mr. Thomas's objections to the PSR, the loss figure supplied by ClickMotive and adopted by the Probation Office grossly misstates

ClickMotive's actual losses compensable under the MVRA. Mr. Thomas therefore respectfully requests that the Court limit restitution to ClickMotive's actual proven losses, consistent with the above analysis.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court determine that a non-custodial sentence is sufficient to satisfying the objectives of sentencing.

Dated:    Brooklyn, New York
          August 24, 2016


**TOR EKELAND, P.C.**

By: <u>/s/ Aaron Williamson</u>
Aaron Williamson
Tor Ekeland
195 Plymouth St, Floor 5
Brooklyn, NY 11201
(718) 737-7264

*Attorneys for Defendant Michael Thomas*